*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0390p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

ALLEN V. OSBORNE,

        *Defendant-Appellant.*

No. 07-5572

> Appeal from the United States District Court
> for the Western District of Kentucky at Bowling Green.
> No. 06-00006—Thomas B. Russell, District Judge.

Argued: September 15, 2008

Decided and Filed: October 28, 2008

Before: MARTIN, ROGERS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Todd A. Bussert, LAW OFFICE OF TODD A. BUSSERT, New Haven, Connecticut, for Appellant. Monica Wheatley, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Todd A. Bussert, LAW OFFICE OF TODD A. BUSSERT, New Haven, Connecticut, for Appellant. Monica Wheatley, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. In this criminal appeal, Allen Osborne, a modeling agent who defrauded Fruit of the Loom with the help of a Fruit of the Loom employee, appeals his conviction of conspiracy to commit mail fraud and his resulting below-Guidelines sentence. Osborne argues that a variance between the indictment and the proof presented at trial affected his substantial rights and therefore mandates reversal of his conviction. The indictment charged one conspiracy while the proof presented at trial may have established two separate conspiracies, one of which did not involve Osborne. He also argues that his sentence is both procedurally and substantively unreasonable. For the reasons that follow, we affirm Osborne's conviction and sentence.

This case arises out of a scheme between the owner of modeling agency Talent Services Corporation and an employee of clothing company Fruit of the Loom to defraud Fruit of the Loom by submitting false bills for modeling services supposedly performed at trade shows. Osborne, the appellant in this case, was a modeling agent with Wilhelmina Modeling Agency. He also owned

and operated Talent Services. Osborne handled Wilhelmina's account with Fruit of the Loom and was therefore responsible for providing models for Fruit of the Loom's trade shows and for submitting bills for their services. Michael Wilson, Fruit of the Loom's Director of Trade Show Merchandising, was responsible for approving bills associated with trade shows. Osborne and Wilson worked together when Fruit of the Loom used Wilhelmina's models.

Sometime around January 2000, Wilson informed Osborne that Wilson's son was in substantial debt to drug dealers. Wilson and Osborne devised a scheme whereby Osborne would submit invoices from Talent Services to a third-party vendor that handled Fruit of the Loom's billing for the various costs associated with trade shows. Wilson would then approve the expenses for modeling services, which were never actually provided, when the vendor submitted the invoices to Fruit of the Loom. Osborne paid part of the fraudulent proceeds to Wilson in cash, sometimes in person and sometimes via Federal Express.

In addition to these cash payments, Osborne provided various models to entertain Wilson after hours at trade shows. Osborne would then deduct the cost of paying these models from Wilson's portion of the fraudulent proceeds. One of these models was Osborne's co-defendant, Kevin Schepman. Although Schepman may have been unaware of the details of the scheme, he was aware of its basic contours, agreed to claim he worked for Fruit of the Loom if asked, and received a substantial part of the fraudulent proceeds as compensation for entertaining Wilson. At some point in 2002, Wilson explained to Schepman how the scheme worked. Wilson and Schepman decided that Schepman would form his own modeling agency in order to perpetrate a similar fraud. Schepman formed Blue Steel Group for this purpose.

In May 2002, with the Blue Steel fraud underway, Wilson contacted Osborne and suggested they discontinue their Talent Services scheme. Osborne agreed. In April 2003, however, Osborne contacted Wilson and requested that they reinitiate the scheme through Talent Services. Between April and December 2003, Osborne submitted and Wilson approved three additional invoices. From 2000 to 2003, Fruit of the Loom made payments to Talent Services totaling $187,523 as a result of the fraudulent scheme. Wilson was fired from Fruit of the Loom in 2004 for an unrelated matter.

In February 2006, the United States indicted Wilson, Osborne, and Schepman, alleging a single mail fraud conspiracy that extended from December 2000 to December 2003. Wilson pled guilty to the charges, but Osborne and Schepman elected to go to trial. The indictment alleged twelve overt acts, seven of which concerned Osborne and the original Talent Services scheme and five of which concerned Schepman and the Blue Steel scheme. The indictment did not specifically refer to the three fraudulent billings by Osborne that occurred after April 2003, but those actions fell within the time frame set out in the indictment and the jury heard testimony on them.

At the conclusion of the trial, the court instructed the jury that it must find three elements beyond a reasonable doubt:

> First, that two or more persons conspired or agreed to commit the crime of mail fraud.
>
> Second, that the defendant knowingly and voluntarily joined the conspiracy.
>
> And third, that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

The district court further specified, "The government does not have to prove all of these [twelve overt] acts were committed . . . but the government must prove that at least one of these acts was committed by a member of the conspiracy."

The jury convicted Osborne and Schepman each of conspiracy to commit mail fraud but did not convict either of mail fraud. At sentencing, the court held Osborne responsible for the entire $187,523 fraudulently billed by Talent Services. This amount produced an Offense Level of 16 under the advisory Sentencing Guidelines. In light of Osborne's Category I criminal history, the Guidelines suggested a sentence range of twenty-one to twenty-seven months of custody, two to three years of supervised release, and a $5000 to $50,000 fine. The court determined that a sentence of fifteen months of custody, two years of supervised release, and restitution with no additional fine was sufficient to comply with the purposes of 18 U.S.C. § 3553(a). In so ruling, the district court discussed and analyzed the 18 U.S.C. § 3553(a) factors, including the nature and circumstances of Osborne's offense, Osborne's history and characteristics, the need for deterrence, and the need to avoid unwarranted sentence disparity among defendants with similar records found guilty of similar conduct.

Osborne now appeals his conviction, claiming a variance between the indictment, which charged one conspiracy, and the proof at trial, which he asserts proved two separate conspiracies, only one of which involved him. He also appeals his below-Guidelines sentence, claiming it was imposed in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005).

Osborne is not entitled to have his sentence reversed even if a variance existed between the indictment and the proof at trial. A variance is not per se prejudicial. "To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant." *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000) (citations omitted). Where an indictment charges one conspiracy and "the evidence demonstrates only multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *United States v. Caver*, 470 F.3d 220, 237 (6th Cir. 2006) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

If a variance existed in Osborne's case, it was harmless. The district court clearly instructed the jury that, in order to find Osborne guilty, it had to determine that two or more persons agreed to commit mail fraud, that Osborne knowingly took part in the conspiracy, and that a member of the conspiracy committed an overt act in furtherance of the conspiracy. Even if we assume that the Talent Services and Blue Steel schemes were completely distinct conspiracies, there is little realistic possibility that the jury based its determination of Osborne's guilt on the Blue Steel scheme. As this court noted in *United States v. Caver*, "[t]he primary risk is the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy," which risk "increases in direct proportion to the number of defendants, and the number of conspiracies demonstrated at trial." 470 F.3d at 237 (citing *Kotteakos*, 328 U.S. at 774, 766). Assuming a variance in *Caver*, this court concluded that any potential error did not prejudice the defendants because the case involved only two conspiracies and three defendants, the defendants were charged with conduct of approximately equal culpability, and the witnesses at trial were careful to specify which interactions they had with each individual defendant. 470 F.3d at 237. Osborne's situation likewise presents little risk of transference of guilt between the two defendants. The evidence established at most two conspiracies among only three people, the defendants were charged with similarly culpable conduct (meaning Osborne was not "forced to endure an extended trial where the bulk of the evidence did not pertain to him"), and the government's main witness was careful to specify "what interactions [he] had had with each individual defendant." *Id.* The evidence relating to the Blue Steel fraud was clearly demarcated and not likely to confuse the jury.

Supreme Court precedent supports a holding that where, as here, there is little chance of jury confusion and shifting of blame between conspiracies, a variance is harmless error. In *Berger v.*

*United States*, 295 U.S. 78, 80-82 (1935), the Court determined that Berger's substantial rights had not been prejudiced by a variance between the indictment, which charged a single conspiracy involving all defendants, and the proof, which demonstrated two separate conspiracies. In that case, the Court observed that where the indictment adequately described the conspiracy with which the defendant was charged, a variance was not fatal merely because "proof of a conspiracy with which he was not connected was also furnished and made the basis of a verdict against others." *Id.* at 81. The Court reached the opposite conclusion in *Kotteakos v. United States*, a case that involved a similar variance but many more defendants and individual conspiracies, concluding that the defendant's substantial rights had clearly been affected by the variance. 328 U.S. at 772-74. The Court distinguished its earlier opinion in *Berger*, despite the similar legal scenarios involved in both cases, because of the sheer number of defendants and separate conspiracies involved. *Id.* (noting that the harmless error principle established in *Berger* did not extend to a situation involving more than thirty defendants and at least eight separate conspiracies). Osborne's situation, which involves straightforward and easily understood facts, fits within the parameters of *Berger* and does not raise the concerns present in *Kotteakos*.

Citing both *Berger* and *Kotteakos*, this court has concluded that a variance in a conspiracy case is harmless where "proof of the acts committed in furtherance of both conspiracies [i]s not likely to confuse the jurors and cause them to transfer guilt from one defendant to another across the line separating the conspiracies." *United States v. Mack*, 837 F.2d 254, 258 (6th Cir. 1988). *Mack* involved four defendants and potentially two separate conspiracies. *Id.* at 257-58. Like the proof in *Mack*, the proof presented at Osborne's trial was not likely to confuse the jury. If there was a variance between the indictment and the evidence presented at trial, an issue on which we take no position, the error was harmless.

Osborne's resulting below-Guidelines sentence is both procedurally and substantively reasonable, easily warranting affirmance under our limited abuse-of-discretion scope of review. *See Gall v. United States*, 128 S. Ct. 586, 594 (2007). The district court properly exercised its authority to determine the amount of loss attributable to Osborne for the purpose of calculating his sentence. The Supreme Court's holding in *Booker* and the subsequent precedent of this circuit clearly demonstrate that a district court may make findings of fact in order to calculate a sentence under the advisory Sentencing Guidelines. *See United States v. Booker*, 543 U.S. 220, 233 (2005); *United States v. Kosinski*, 480 F.3d 769, 776 (6th Cir. 2007). "*Booker* did not eliminate judicial fact-finding. Instead, the remedial majority gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range." *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005). In making its findings of fact, the district court adequately articulated the basis for calculating the loss attributable to Osborne. The court held Osborne responsible for the value of the payments he received from Fruit of the Loom based on fraudulent invoices he personally submitted.

Finally, under the deferential abuse-of-discretion scope of review prescribed by *Gall*, it is clear that Osborne's below-Guidelines sentence was not substantively unreasonable.

For the foregoing reasons, we AFFIRM Osborne's conviction and sentence.